# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **BELLSOUTH TELECOMMUNICATIONS, INC.** | |
| **Petitioner,** | |
| **v.** | **1:04-cv-2790 -WSD** |
| **NUVOX COMMUNICATIONS, INC.; THE GEORGIA PUBLIC SERVICE COMMISSION; ROBERT B. BAKER, in his official capacity as Commissioner of the Georgia Public Service Commission; H. DOUG EVERETT, in his official capacity as Commissioner of the Georgia Public Service Commission; ANGELA E. SPEIR, in her official capacity as Commissioner of the Georgia Public Service Commission; STAN WISE, in his official capacity as Commissioner of the Georgia Public Service Commission** | |
| **Respondents.** | |

## OPINION AND ORDER

This matter is before the Court on Petitioner's BellSouth

Telecommunications, Inc.'s ("BellSouth") First Amended Petition for Judicial

Review and Complaint for Declaratory and Injunctive Relief [3] challenging an

Order of the Georgia Public Service Commission (the "GPSC") interpreting an

interconnection agreement (the "Agreement") between BellSouth and NuVox

Communications, Inc. ("NuVox").

## I. FACTUAL BACKGROUND

On September 23, 2004, BellSouth filed a petition for judicial review and

complaint for declaratory judgment against the GPSC, its Commissioners, and

NuVox.  BellSouth complains that the GPSC improperly interpreted a

telecommunications interconnection agreement between BellSouth and NuVox[1]

and imposed unwarranted restrictions on BellSouth's right to audit NuVox's local

exchange traffic, beyond those in its agreement with NuVox.

A.  <u>The Legal and Technological Framework</u>

This dispute arises in the context of the federal government's facilitation of

increased competition in the telecommunications industry.  Traditionally, and as

recently as the last decade, the telecommunications industry operated as a natural

monopoly.  Congress implemented the Telecommunications Act of 1996 (the

---

[1] The Agreement itself lists as parties BellSouth and TriVergent
Communications, Inc.  The parties do not explain how NuVox became a party-in-
interest to the Agreement.  NuVox does not dispute that it is a party to the
Agreement, and the Court will accept that it is.

"1996 Act") to foster an environment to promote competition among telecommunications providers.  See Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) (codified in scattered sections of title 47 of the United States Code).

Access to infrastructure is one of the primary barriers to competition in the telecommunications industry.  See, e.g., MCI Worldcom Comm., Inc. v. BellSouth Telecomm., Inc. 446 F.3d 1164, 1166-67 (11th Cir. 2006).  Incumbent local exchange carriers ("ILECs") such as BellSouth own much of the infrastructure necessary to provide telecommunications service to consumers.  Id.  This infrastructure consists of circuits, wires, switches, and other hardware necessary to route and carry electronic signals from one communications device to another.  Of particular interest for the present dispute is the Enhanced Extended Loop ("EEL"), a type of telephone circuit that connects individual customers to an exchange carrier.  (Principal Brief on the Merits of Petitioner BellSouth Telecommunications, Inc. at 9-10) ("BellSouth Brief").  See also Competitive Telecomms. Ass'n v. FCC, 309 F.3d 8, 10-11 (D.C. Cir. 2002).  EELs can be used to carry local exchange service or to carry more profitable special access services, such as long-distance toll calling.

In the past, ILECs operating as monopolies had the opportunity both to absorb the tremendous cost of building infrastructure over a span of decades and to recover that cost without the impediment of rate competition.  MCI Worldcom, 446 F.3d at 1168.  The cost of developing infrastructure comprises a commercially forbidding barrier to entry into the field.  Id.

Accordingly, the 1996 Act mandates that ILECs share infrastructure with competitive local exchange carriers ("CLECs").  This sharing is accomplished through the process known as "unbundling."  Unbundling requires ILECs to "make elements of their networks [such as EELs] available on an unbundled basis to new entrants at cost-based rates."  In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, 18 F.C.C.R. 16978, 16984 (2003). See also 47 U.S.C. §§251-252 (2000).  ILECs must make unbundled network elements such as EELs available to CLECs on reasonable terms, thus removing a forbidding barrier and facilitating the entry of competition into the field.  Id. §251 (b), (c).

The 1996 Act offers ILECs and CLECs a choice regarding the terms of interconnection.  The preferred option is for the parties to negotiate an interconnection agreement, voluntarily and without regard to the comprehensive

guidelines embodied in 47 U.S.C. §§ 251(b) and (c) and its attendant rules, orders, and regulations.  47 U.S.C. § 252 (a)(1) (2000).  If the parties opt not to negotiate or if negotiation fails, state public service commissions ("PSCs") are obligated to arbitrate an interconnection agreement.  Id. § 251 (b)(1).  When the provisions of an interconnection agreement are arbitrated, PSC's must determine the provisions in accordance with §§ 251(b) and (c).  Id. § 252(c)(1).

Although the 1996 Act requires parties to reach an interconnection agreement, ILECs are not required to surrender access to their infrastructure unconditionally or without compensation.  The 1996 Act allows ILECs to charge for access, and permits ILECs to impose reasonable conditions on interconnection. Id. §§ 251 (c)(2)(D), 252 (b)(2)(B).  One typical restriction relevant to the present dispute is for the CLEC to certify that it will provide "a significant amount" of local exchange carrier service on each EEL, as opposed to more lucrative special rate services like long-distance toll calls.  Whether the CLEC is using the EEL as allowed may be verified by audit.

The Federal Communications Commission ("FCC") is authorized to promulgate regulations to implement the 1996 Act.  Id. § 251(d).  The Act and its implementing regulations guide and govern the state commissions in their task of

arbitrating, approving, interpreting, and enforcing interconnection agreements.

One Court has noted the uniqueness of this situation, describing state agencies as

deputies which regulate on behalf of the FCC.  MCI Telecomm. Corp. v. Illinois

Bell Tel. Co., 222 F.3d 323, 344 (7th Cir. 2000) ("Congress has offered the

states . . . a role as what the carriers have called a 'deputized' federal regulator.").

The FCC has issued voluminous regulations, orders, and clarifying

statements concerning the 1996 Act.  Among these is the Supplemental Order

Clarification In the Matter of Implementation of the Local Competition Provisions

of the Telecommunications Act of 1996, 15 F.C.C.R. 9587 (2000)  (the "June 2,

2000 Order").[2]

_____

[2] The June 2, 2000 Order covers a wide range of topics and implements
several sections of title 47.  For the purposes of the present motion, however, the
relevant portions of the June 2, 2000 Order implement 47 U.S.C. § 251(c),
addressing the terms of interconnection agreements.  The purpose of the relevant
portions of the June 2, 2000 Order therefore is to assist PSCs in arbitrating terms.
Section 252(a) dictates that parties can negotiate the provisions of an
interconnection agreement without regard to §§ 251(b) and (c), which would
include the implementing portions of the June 2, 2000 Order.

B.  The Agreement Underlying the Present Dispute

ILEC BellSouth and CLEC NuVox executed a voluntary interconnection

agreement on June 30, 2000.  The Agreement was approved by the GPSC.  Section

10.5.4 of the Agreement, which lies at the heart of the present dispute, reads:

> BellSouth may, at its sole expense, and upon thirty
> (30) days notice to [Nuvox], audit [Nuvox's]
> records not more than one [sic][3] in any twelve-
> month period, unless an audit finds non-
> compliance with the local usage options referenced
> in the June 2, 2000 Order, in order to verify the
> type of traffic being transmitted . . .

BellSouth contends that this provision on its face defines the parties'

auditing rights and restrictions.  NuVox and the GPSC disagree, arguing that the

Agreement incorporates the June 2, 2000 Order in whole and imposes the

additional requirements that BellSouth:  (I) demonstrate a concern before it is

allowed to conduct an audit; and (ii) use an independent auditor in performing the

audit.

While BellSouth and NuVox were negotiating the terms of the Agreement,

the FCC issued the June 2, 2000 Order.  The parties do not dispute that they were

aware of the June 2, 2000 Order at the time the Agreement was executed, nor do

---

[3]  The court interprets this as either "one time" or "once."

they dispute that the June 2, 2000 Order constituted federal law when the

Agreement was executed.

The June 2, 2000 Order implements the 1996 Act.  June 2, 2000 Order at

9587.  In its introduction, the June 2, 2000 Order identifies three purposes that the

FCC intended to accomplish by issuing the June 2, 2000 Order.  The third purpose

is relevant to the present dispute:

> Third, we clarify that incumbent local exchange
> carriers (LECs) must allow requesting carriers to
> self-certify that they are providing a significant
> amount of local exchange service over
> combinations of unbundled network elements, and
> we allow incumbent LECs to subsequently [sic]
> conduct limited audits by an independent third
> party to verify the carrier's compliance with the
> significant local usage requirements.

Id. at 9587-88.

ILEC's are allowed to verify whether a CLEC is using an EEL for a

significant amount of local exchange service by conducting an audit of the CLEC's

records.  Paragraph 31 of the June 2, 2000 Order guides PSCs concerning what

audit rights should be arbitrated in the event that parties fail to arrive at a voluntary

agreement.  Paragraph 31 states:  "[I]ncumbent LECs may not require a requesting

carrier to submit to an audit prior to provisioning combinations of unbundled loop

and transport network elements." Id. at 9603.  This statement is clarified by

footnote 86, which reads:

> The incumbent LEC and competitive LEC signatories . . .
> state that audits will not be routine practice, but will only
> be undertaken when the incumbent LEC has a concern
> that the requesting carrier has not met the criteria for
> providing a significant amount of local exchange service.
> We agree that this should be the only time that an
> incumbent LEC should request an audit.

Id. at 9603 n.86 (citations omitted).   The proper interpretation of these provisions

and their application to the Agreement lies at the heart of the present dispute.

C.  The Present Dispute

The parties substantially agree on the facts underlying the present dispute.

On July 30, 2000, BellSouth and NuVox entered into a voluntary interconnection

Agreement that granted NuVox access to a number of BellSouth EELs on the

condition that NuVox certify that it would provide a significant amount of local

exchange service over those EELs.  The Agreement included an audit provision,

§10.5.4, which allows BellSouth to conduct an audit of NuVox at its own expense

upon providing thirty days notice.

On March 15, 2002, BellSouth provided written notice to NuVox of its

intent to audit NuVox's records pursuant to § 10.5.4 of the Agreement.  NuVox

refused to allow the audit on the grounds that, under the June 2, 2000 Order, BellSouth could not conduct an audit unless it first demonstrated a "concern" that NuVox was violating its certification and unless it used an "independent" third-party auditor.  BellSouth replied that the plain language of the Agreement entitled BellSouth to audit NuVox upon thirty days notice and that there were no further restrictions or conditions.  NuVox again refused to comply, relying on its previous objections.

On May 13, 2002, BellSouth filed a complaint with the GPSC to enforce §10.5.4 of the Agreement.  On June 29, 2004, the GPSC issued an Order that held, in relevant part: (1) that the Agreement required, as a condition to conducting an audit, that BellSouth "demonstrate a concern" NuVox was violating its certification that it was providing a significant amount of local exchange traffic over BellSouth's EELs;  (2) that BellSouth had demonstrated a concern with respect to 44 of the EELs leased to NuVox and could only conduct an audit of those circuits, but that the audit would be expanded if the audit of the 44 EELs indicated other problems.  If so, BellSouth could reapply to the GPSC for an audit of other circuits; and (3) that the Agreement requires BellSouth to use an independent auditor that complies with standards set by the American Institute of

Certified Public Accountants ("AICPA").  (June 29, 2000 Order Adopting In Part and Modifying In Part the Hearing Officer's Recommended Order at 15-16) (the "GPSC Order").

BellSouth petitioned the GPSC to reconsider its Order.  On August 24, 2004, the GPSC affirmed its original decision.  On September 23, 2004, BellSouth filed the present petition for review and declaratory judgment.

BellSouth seeks review of the following issues:  (1) Whether the GPSC violated the 1996 Act by incorporating the June 2, 2000 Order into the Agreement; (2) Whether the GPSC erred in interpreting the June 2, 2000 Order to require ILECs to "demonstrate a concern" as a condition prior to conducting an audit; and (3) Whether the GPSC erred by interpreting the Agreement to require BellSouth to "demonstrate a concern" prior to conducting an audit, and to require BellSouth to use an independent third-party auditor.  (Petitioner's First Amended Petition for Judicial Review and Complaint for Declaratory and Injunctive Relief at 12-15.)

## II.  DISCUSSION

A.  Jurisdictional Issues

The GPSC raises several jurisdictional issues, including allegations of mootness and unripeness.  Specifically, GPSC argues this Court lacks jurisdiction

because BellSouth's claims concerning whether the Agreement requires it to "have a concern" prior to audit are not ripe, and that BellSouth's claims concerning whether the Agreement requires it to hire an independent auditor are moot. (Brief on the Merits of Defendants [Respondents] Georgia Public Service Commission and Robert B. Baker et. al. at 11-13) ("GPSC Brief"). The Court disagrees. The Court has jurisdiction to review the GPSC's Order, and each issue represented by BellSouth is justiciable.

      1. *Jurisdiction*

      As a general matter, this Court exercises jurisdiction to review the GPSC's order for compliance with federal law under 28 U.S.C. §1331. A district court's jurisdiction to review determinations of a PSC interpreting or enforcing interconnection agreement under the 1996 Act is beyond question. Verizon Maryland, Inc. v. Public Service Com'n of Maryland, 535 U.S. 635, 643-44 (2002), ("nothing in the Act displays any intent to withdraw federal jurisdiction under § 1331; we will not presume that the statute means what it neither says nor fairly implies.") Id. at 644. The Eleventh Circuit specifically has held that district courts are granted jurisdiction over PSC orders interpreting interconnection agreements by 47 U.S.C. § 252(e)(6), which permits federal courts review

"determinations" made by state commissions under the Act.  <u>BellSouth Telecomm., Inc. v. MCImetro Access Transmission Services, Inc.</u>, 317 F.3d 1270, 1277-78 (11th Cir. 2003) ("it is consistent with the [1996 Act] to have state commissions interpret contracts and subject their interpretations to federal review in the district courts.").

This Court has jurisdiction to consider the GPSC's interpretation of Georgia law and of the Agreement under that law.  <u>Id.</u> at 1278-79.

2.  <u>Ripeness</u>

The GPSC claims that whether BellSouth must "demonstrate a concern" as a condition to conducting an audit is not ripe because "BellSouth has yet to be harmed, and may never be harmed by the GPSC's decision . . . ."  (GPSC Brief at 11.)  The GPSC asserts this conclusion on the fact that its Order did not foreclose all possibility of BellSouth conducting an audit of all the EELs.  It argues the Order allows BellSouth to audit 44 of the circuits.  (GPSC Order at 16.)  It contends further that if BellSouth is able to show some evidence justifying a concern over the integrity of NuVox's use certification of other circuits, the GPSC may allow a broader audit.  (<u>Id.</u>)  The GPSC concludes that whatever harm

BellSouth may suffer is still speculative, and thus its claims are not ripe.  (GPSC Brief at 12.)

The "ripeness" requirement safeguards the Article III "case or controversy" requirement and accounts for "prudential considerations arising from problems of prematurity and abstractness that may present insurmountable obstacles to the exercise of the court's jurisdiction. . . ."  Johnson v. Sikes, 730 F.2d 644, 648 (11th Cir. 1984).  The "basic rationale is to prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements. . . ." Id.  (citations omitted).  The Eleventh Circuit ripeness evaluation has a "twofold aspect" in which it considers "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  Id.  See also Cheffer v. Reno, 55 F.3d 1517, 1524 (11th Cir. 1995); Ouachita Watch League v. Jacobs, --F.3d--, 2006 WL 25284888 (11th Cir., Sept. 5, 2006).  Pure issues of law are considered fit for judicial decision.  See, Cheffer, 55 F.3d at 1524.

Three further factors must be considered under the fitness/hardship test:

> In applying the fitness and hardship prongs, we must consider the following factors:  (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3)

> whether the courts would benefit from further factual
> development of the issues presented.

Beaulieu v. City of Alabaster, 454 F.3d 1219, 1227 (11th Cir. 2006) (citations

omitted).

BellSouth's claim that the Agreement does not impose a requirement that

BellSouth "demonstrate a concern" prior to conducting an audit is ripe.  First, the

claim is fit for judicial decision.  The Court is required only to consider issues of

law, particularly the interpretation of federal law, state law, and contract to reach a

decision.  No further factual development is necessary.

The Court's consideration of this issue also does not interfere

inappropriately with GPSC action.  The GPSC has ordered BellSouth to engage in

a progressive auditing process that likely will require further administrative action

by the GPSC, at the very least when the GPSC is required to determine whether

BellSouth has made a showing sufficient to justify an audit of the EELs after the

initial 44 are audited.  Action by this Court would interfere with the stepped system

imposed by the GPSC, possibly by abolishing it altogether.  If action by this Court

interfered with the GPSC's system, however, it would do so appropriately.  That is,

while the GPSC has authority under § 252(e) to interpret and enforce the

Agreement, BellSouth Telecomm., Inc. v. MCImetro Access Transmission, 317
F.3d 1270, 1277-78 (11th Cir. 2003), this authority is subject to review by a district
court.  Id.; see also 47 U.S.C. § 252 (e)(6).  The GPSC is not entitled to operate
without oversight.  If a party claims to be aggrieved, § 252 (e)(6) entitles this Court
to review the GPSC's orders, and, if warranted, to take corrective action.  In this
case, the GPSC issued an order under which BellSouth claims to be aggrieved.  If
the Court finds that the GPSC's determinations were in error and takes corrective
action that interferes with the GPSC's proposed actions, such interference cannot
be said to be inappropriate.

Second, BellSouth will suffer hardship if the Court refuses to hear this issue.
BellSouth claims it is entitled under the Agreement to audit all of its EELs on
thirty days notice.  The GPSC is restricting the scope of the rights to which
BellSouth claims it is entitled.  This constitutes a hardship.

Furthermore, the conditions under which BellSouth is permitted to audit
NuVox affects the commercial relationship between the parties.  Restrictions
beyond the scope of the Agreement (as claimed by BellSouth), or even uncertainty
regarding the scope of BellSouth's audit rights, imposes upon BellSouth a relative
competitive disadvantage. The more restrictions in place on BellSouth's audit

rights, the easier for NuVox to violate the terms of the Agreement, including by

providing more lucrative non-local exchange services.  The 1996 Act forces direct

competitors like BellSouth and NuVox to deal.  BellSouth cannot simply walk

away from the interconnection agreement.  If, as BellSouth claims, the GPSC

Order imposes undue restrictions on BellSouth's ability to verify its competitor's

good faith in this forced relationship, its commercial interests are already affected.

In short, BellSouth claims that the GPSC Order puts it in the difficult position of

being obligated to deal with a direct competitor while at the same time restricting

its ability to monitor that deal.  This issue is ripe to be addressed.

The GPSC also argues that the "demonstrate a concern" issue is not ripe,

because the GPSC has not yet issued a "final" decision on the matter.[4]  (GPSC

Brief at 12.)  This contention is without merit.  Nothing in the 1996 Act restricts

judicial review to "final" administrative decisions.

47 U.S.C. § 252(e)(6) constitutes an independent basis of jurisdiction under

which this Court is entitled to review state PSC determinations regarding

interconnection agreements.  BellSouth Telecomm., Inc., 317 F.3d at 1277

_____

[4]  The GPSC apparently still has not issued a "final"decision.  The practical
effect of this is that the GPSC Order has indefinite application, and this is final as a
practical matter.

("Section 252(e)(6) gives federal courts jurisdiction to review 'determinations' made by state commissions."). Section 252 (e)(6) states: "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court. . . ." The statute does not contain a "finality" requirement as a condition of this Court's review. The GPSC has made a determination, NuVox is relying on it by refusing audits and BellSouth claims to be aggrieved by it. That is all Section 256 (e)(6) requires. The fact that the GPSC anticipates further involvement does not affect the ripeness of BellSouth's petition to this Court.

3. _Mootness_

The GPSC claims that the issue of whether BellSouth is required to hire an independent auditor is moot. The GPSC argues that because BellSouth is already conducting an audit by an independent auditor, there is no current controversy over whether an independent auditor is required. (GPSC Brief at 13-14.) The GPSC further claims that, because it has stated that it will accord no weight in its role as fact-finder to a non-independent audit, a BellSouth victory on this issue would be "fruitless" because the GPSC would not respect a complaint based on such an audit Id. at 14-15. The Court disagrees with the GPSC's conclusions.

-18-

The doctrine of mootness exists to ensure, consistent with Article III of the Constitution, that federal courts avoid issuing advisory opinions by only deciding active cases or controversies.  See Adler v. Duval County School Bd., 112 F.3d 1475, 1477 (11th Cir. 1997).  Article III requires that "a plaintiff must have suffered some actual injury that can be remedied or redressed by a favorable judicial decision."  Nat'l Advert. Co. v. City of Ft. Lauderdale, 934 F.2d 283, 286 (11th Cir. 1991).

The Eleventh Circuit addressed a mootness issue similar to the one here in MCI Telecomm. Corp. v. BellSouth Telecomm., Inc., 298 F.3d 1269 (11th Cir. 2002).  In MCI Telecomm., CLEC MCI challenged the Florida PSC ("FPSC") resolution of a dispute over the terms of an interconnection agreement with ILEC BellSouth.  Id. at 1271.  The parties were not able to negotiate voluntarily all of the terms of an interconnection agreement, and at least some of the terms were required to be arbitrated by the FPSC.  Id.  During the arbitration, the FPSC refused MCI's request to include enforcement and compensation provisions in the agreement on the grounds that it lacked authority to do so.  Id.  MCI appealed to the district court for the Northern District of Florida, which reversed the FPSC determination, holding that the FPSC was required to arbitrate any issue presented

in an arbitration petition under the 1996 Act.  Id. at 1273.  The FPSC held

arbitration hearings to consider the requested provisions, as required by the district

court.  Id.

On BellSouth's appeal to the Eleventh Circuit, MCI argued that the issue of

the FPSC's authority to consider the enforcement provision was moot because

"[h]aving [followed the district court's order], there was nothing more for the

FPSC to do. . ."  Id.  In other words, because the FPSC had already considered the

provision, MCI argued that any decision on whether the FPSC should have done so

would be purely academic.  Id.  The Eleventh Circuit disagreed, and found

BellSouth presented a justiciable issue.  Id. at 1274.

The Eleventh Circuit court noted that a reversal of the District Court which

negated the outcome of the court-mandated arbitration proceedings would, in

effect, "grant[] meaningful relief to BellSouth, not merely offer[] an advisory

opinion on a hypothetical question concerning the FPSC's power under the Act.

The possibility of that outcome is sufficient for a finding that the question is not

moot . . ."  Id. at 1273-74.  The Eleventh Circuit further noted:  "Temporary

compliance with a decree pending appeal . . . clearly should not moot a case.'"  Id.

at 1274 n.6, quoting Charles A. Wright et. al., Federal Practice and Procedure §

3533.7, at 355 (2d. ed. 1984).  See also Nat'l Advert. Co. v. City of Ft. Lauderdale,

934 F.2d 283, 286 (11th Cir. 1991).  ("voluntary cessation of a challenged practice

does not deprive a federal court of its power to determine the legality of the

practice.")

The "independent auditor" issue also is not moot.  BellSouth contends that

the Agreement grants to it the right to conduct audits with an auditor of its

choosing, and does not restrict it to AICPA-certified auditors. The GPSC Order

prevents BellSouth from exercising what BellSouth argues are the full scope of its

rights under the Agreement, both for the present and any future audits.  If the Court

overturns the GPSC Order, BellSouth argues it would be granted meaningful relief,

and not merely issue an advisory opinion.  Whether BellSouth is required to use an

independent auditor is a live controversy that is not mooted by its temporary

compliance with the GPSC Order pending the present review.[5]

_____

[5] The GPSC's declaration that it will not accord any weight to an audit
conducted by a non-independent auditor does not alter the mootness analysis.  The
controversy here is not over the weight that the GPSC can or must give to the
outcome of a BellSouth audit, but rather over the scope of the audit rights granted
to BellSouth under the Agreement.  BellSouth contends that it contracted for the
right to conduct audits as it determines is appropriate.  No matter how unpersuasive
the GPSC might find a "non-independent" audit, there exists a live controversy
over BellSouth's alleged contractual right to conduct one.

B.  <u>Standard of Review of GPSC Decisions</u>

This is a review of an administrative decision by the GPSC regarding the interpretation and enforcement of the interconnection Agreement between BellSouth and NuVox.  The Eleventh Circuit has set out a two-tiered standard to govern such determinations.  The Court accords no deference to GPSC interpretations of federal law, and these issues are reviewed *de novo*.  <u>MCI Worldcom Comm., Inc. v. BellSouth Telecomm., Inc.</u>, 446 F.3d 1164, 1170 (11th Cir. 2006).  The GPSC's factual findings are reviewed under an "arbitrary and capricious" standard.  <u>Id.</u>

The parties disagree on what standard of review applies to the GPSC's interpretation of the interconnection agreement under Georgia law.  BellSouth, relying on the general principle that contract interpretation is a matter of law, argues that the GPSC is not particularly well-suited to address issues of Georgia state law.  BellSouth thus contends the Court should exercise *de novo* review of the GPSC's state law interpretation to the Agreement.  (BellSouth Brief. at 5-7.).  NuVox and the GPSC disagree.  They maintain that the Court should accord the GPSC deference in all findings except interpretations of federal law.  (GPSC Brief at 9); (Response Brief on the Merits of Respondent NuVox Communications, Inc.

-22-

at 9-11) ("NuVox Brief").  The Eleventh Circuit has not addressed this particular

standard of review issue and this Court considers it as one of first impression in

this circuit.

In <u>BellSouth Telecomm. v. MCIMetro Access Services, Inc.</u>, the Eleventh

Circuit held that the statutory duty of state PSCs to approve or reject voluntary

interconnection agreements includes the power to interpret the agreements.  317

F.3d 1270, 1276-77 (11th Cir. 2003) (en banc).  In doing so, the Eleventh Circuit

approved the FCC observation that state commissions were "well-suited to address

disputes arising from interconnection agreements."  <u>Id.</u> at 1277 (citations omitted).

The Eleventh Circuit further noted that "in granting to the public service

commissions the power to approve or reject interconnection agreements, Congress

intended to include the power to interpret and enforce <u>in the first instance</u>. . . ."  <u>Id.</u>

(emphasis added).  The court reasoned:

> A state commission's authority to approve or reject
> an interconnection agreement would itself be
> undermined if it lacked authority to determine in
> the first instance the meaning of the agreement it
> has approved.  A court might ascribe to the
> agreement a meaning that differs from what the
> state commission believed it was approving--
> indeed, the agreement as interpreted by the court

> may be one the state commission would never
> have approved in the first place.

Id. at n.9.  This commentary by the Eleventh Circuit on the fitness of state public

service commissions to interpret interconnection agreements under state law is

persuasive, and the Court finds that deference to the state-law findings of the

GPSC is appropriate.

This interpretation is consistent with a number of other circuits which have

addressed this issue.  They have accorded deference to PSCs, and have reviewed

issues other than the interpretation of federal law under an "arbitrary and

capricious" standard.  See., e.g., GTE South, Inc. v. Morrison, 199 F.3d 733 (4th

Cir. 1999); U.S. West Comm. v. MFS Intelnet, Inc., 193 F.3d 1112 (9th Cir 1999);

Southwestern Bell Tel. Co. v. Waller Creek Comm., Inc., 221 F.3d 812 (5th Cir.

2000); Southwestern Bell Tel. Co. v. Apple, 309 F.3d 713, 717 (10th Cir. 2002);

Michigan Bell Telephone Co. v. MFS Intelnet of Michigan, Inc., 339 F.3d 428, 433

(6th Cir. 2003).

This Court will review the GPSC's interpretation of the Agreement under

the "arbitrary and capricious" standard.  The arbitrary and capricious standard

requires this court to "determine whether there was a reasonable basis for the . . .

decision." Hunt v. Hawthorne Assocs., Inc., 119 F.3d 888, 911 (11th Cir. 1997)

quoting Jett v. Blue Cross & Blue Shield of Ala., 890 F.2d 1137, 1139 (11th Cir.

1989).  The Court must overturn the decision of the GPSC if it finds a "clear error

of judgment" or if it finds that the GPSC failed to consider "the relevant factors."

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)

overruled on other grounds at Califano v. Sanders, 430 U.S. 99 (1977).

   C.  The GPSC'S Interpretation of Federal Law

      1.  *The GPSC's  Incorporation of the June 2, 2000 Order*

BellSouth contends that the GPSC erred as a matter of federal law by

incorporating into the Agreement all of the provisions of the June 2, 2000 Order

absent any clear expression by the parties that they opted out of one or more of the

provisions.  The Court ultimately agrees with BellSouth that the GPSC erred, but

does so because the GPSC misapplied state, not federal, law.

PSCs are required by 47 U.S.C. §252(e)(1) to approve or reject voluntary

interconnection agreements.  Subsumed in this obligation is the PSC's duty to

interpret and enforce such agreements.  BellSouth Telecomm., Inc. v. MCImetro

Access Transmission Services, Inc., 317 F.3d 1270, 1275-77 (11th Cir. 2003).

PSCs are authorized to interpret interconnection agreements under state law.  47

U.S.C. §252(e)(3) ("nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement. . .").  Accordingly, the GPSC was permitted to interpret the Agreement under Georgia law.

In doing so, the GPSC held that the June 2, 2000 Order was incorporated into the Agreement as a matter of Georgia law, including the rules of contract interpretation.  The GPSC cited two reasons for determining that the Agreement incorporated the June 2, 2000 Order:  First, the GPSC ruled that under Georgia law, "parties are presumed to enter into agreements with regard to existing law." (GPSC Order at 6.)  This "existing law" included the June 2, 2000 Order (which, according to the GPSC, required BellSouth both to "demonstrate a concern" as a condition to conducting an audit and to use only an AICPA certified auditor).  The GPSC further reasoned, "Without language evidencing intent to vary from [the law], it is unreasonable to conclude that NuVox intended to waive its protection." (Id. at 7.)  In other words, the GPSC concluded that Georgia law automatically incorporates into contracts all existing law, except when the contract specifies to the contrary.  (See, e.g., GPSC Brief at 17) ("If parties intend to stipulate that their contract not be governed by existing law, then other governing principles must be

'expressly stated in the contract.'") (citations omitted).  Second, the GPSC contended that § 35.1 of the Agreement served expressly to incorporate all relevant laws, including the SOC, into the Agreement.  (Id. at 16-17); (GPSC Order at 6.)

The GPSC Order does not interpret or rely on federal law to reach its conclusion that the Agreement incorporates the June 2, 2000 Order except when otherwise specified.  The GPSC Order reaches this conclusion based solely to its interpretation of Georgia state law and the Agreement itself.

BellSouth contends that 47 U.S.C. § 252(a)(1) entitles parties to negotiate "without regard to" §§ 251(b) and (c).  BellSouth argues that the GPSC's decision to incorporate § 251(b) and (c) into the Agreement issues § 252(a)(1) and constitutes a violation of the purpose of the 1996 Act.  (BellSouth Brief at 29-31.)

BellSouth's position on this issue overlooks that the GPSC also has federal statutory rights in its "deputy" capacity -- namely to approve or reject interconnection agreements, including the right to interpret and enforce them under state law.  47 U.S.C. § 252(e).  The GPSC's authority to reject voluntary agreements expressly includes the authority to reject agreements "not consistent with the public interest, convenience, and necessity. . ."  47 U.S.C. § 252 (e)(2)(A)(ii).

In the present case, the GPSC interpreted the laws of Georgia to incorporate the June 2, 2000 Order into the Agreement unless the parties provided specifically to the contrary. Leaving aside momentarily any error in the GPSC's application of Georgia law, the GPSC was entitled by statute to interpret the Agreement under Georgia law, and did not contravene the 1996 Act by so doing.

BellSouth does not argue that the GPSC is not entitled generally to interpret the Agreement under Georgia law. Although unclear, BellSouth appears to argue that § 252(a)(1) preempts the "presumption of incorporation" principle of Georgia law upon which the GPSC relied in its interpretation of the Agreement. (BellSouth Brief at 29-31.) This Court finds that the 1996 Act does not preempt the Georgia law presumption of incorporation.

Courts classify preemption into three categories: express, complete (or field), and conflict:

> The Supreme Court has recognized three types of preemption: (1) express preemption, where a federal statute contains "explicit preemptive language"; (2) [complete] preemption, where the federal regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," and (3) conflict preemption, where "compliance with both federal and state regulations is a physical

> impossibility" or where state law "stands as an
> obstacle to the accomplishment and execution of
> the full purposes and objectives of Congress."

This That and the Other Gift and Tobacco v. Cobb County, Ga., 285 F.3d 1319,

1322 (11th Cir. 2002), quoting Wisconsin Public Intervenor v. Mortier, 501 U.S.

597, 604-05 (1991).  To determine preemption, Courts "look to the intent of

Congress in passing the federal law."  Foley v. Luster, 249 F.3d 1281, 1286 (11th

Cir. 2001).  The intent of Congress "may be explicitly stated in the statute's

language or implicitly contained in its structure and purpose."  Id.

The Congressional intentions embodied by the 1996 Act are clear from the

Act's preamble and from its structure and purpose.  The preamble of the 1996 Act

declares it to be:

> An Act to promote competition and reduce
> regulation in order to secure lower prices and
> higher quality service for American
> telecommunications consumers and encourage the
> rapid deployment of new telecommunications
> technologies.

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996)

(codified in scattered sections of Title 47 of the United States Code).

The structure of the 1996 Act bears out the stated goals of the preamble. Section 251 of Title 47 sets out resale, connectivity, infrastructure sharing, and good-faith dealing obligations for all carriers (including extra obligations for incumbent carriers) designed to create an environment in which competition against the entrenched incumbents is possible. Section 252 dictates that ILECs and CLECs must negotiate interconnection agreements, offers the incentive of controlling the provisions of the contract to parties that reach voluntarily agreement, and deputizes state PSCs as the primary regulators in the field.

A common sense reading of the preamble and sections of the 1996 Act demonstrates that the Act's purpose is not to apply the myriad implementing regulations of § 251(b) and (c) to all interconnection agreements. That cannot be the purpose, because § 252 (a)(1) allows parties to contract around those provisions. On the other hand, the 1996 Act also does not allow parties to negotiate contract provisions according to their own unbounded preferences. Section 252 (e)(1) requires that even voluntarily reached agreements are subject to approval by the state PSCs. Against the backdrop of what Congress intended (and did not intend) in the 1996 Act, the Court evaluates what may be preempted here.

Express preemption requires a federal statute that on its face deprives the state of authority to regulate.  Wisconsin Public Intervenor, 501 U.S. at 604-05. ("Congress's intent to supplant state authority in a particular field may be expressed in the terms of the statute.") (emphasis added).  The 1996 Act does not supplant state authority.  To the contrary, § 252 (e) expressly grants to state public service commissions both the right to regulate parties under the Act and the right to enforce state policy and law in the course of that regulation.  47 U.S.C. § 252 (e)(3) ("nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement . . .").  A federal statute that expressly grants regulatory power to states cannot be said to intend to "supplant state authority . . . expressed in the terms of the statute."  The 1996 Act does not preempt expressly Georgia law.

Complete preemption inheres where a particular area is so thoroughly covered by federal law that there is nothing left for the state to regulate without running afoul of the federal scheme.  Wisconsin Public Intervenor, 501 U.S. at 605. The 1996 Act expressly creates room in the telecommunications field for state regulation, and specifically reserves to PSCs the obligation to evaluate interconnection agreements.  47 U.S.C. § 252 (e); BellSouth Telecomm., Inc. v.

-31-

MCImetro Access Transmission Services, Inc. 317 F.3d 1270, 1275-77 (11th Cir. 2003).  Accordingly, the 1996 Act cannot be said to completely preempt the field.

Conflict preemption requires either federal and state laws so irreconcilable that they both cannot physically be obeyed or a state law that obstructs the accomplishment or purpose of a federal law.  Wisconsin Public Intervenor, 501 U.S. at 605.  That situation does not here exist.

The Georgia law "presumption of incorporation" can be reconciled with § 251 (b) and (c).  The GPSC's position that Georgia law incorporates into a contract all existing law unless specifically opted out by the parties does not preclude parties from exercising their rights under § 252(a)(1).  No real tension exists between the federal statute and common law presumption of incorporation, rather, the Georgia "presumption of incorporation" merely serves to incorporate applicable law even if not expressly stated.  In the present case, Georgia law incorporates into the Agreement the entirety of the 1996 Act, which includes § 251 (b) and (c), the implementing June 2, 2000 Order, and § 252 (a)(1).  Georgia law presumptively incorporates § 252 (a)(1) into the Agreement, and thereby mandates that § 252 (a)(1) be given effect.  Georgia law is not only reconcilable with § 252 (a)(1), the state law mandates the federal law's application.

Georgia law likewise does not obstruct the purpose of § 252 (a)(1).  The purpose of the 1996 Act, as noted above, is to encourage competition and to prevent incumbent carriers from exercising a natural monopoly by ensuring infrastructure access to competitors.  In structure and function, the 1996 Act ensures access to CLECs by one of two routes:  either the parties can come to a voluntary agreement, or state agencies can impose an agreement with provisions in accordance with § 251 (b) and (c) through arbitration.  47 U.S.C. § 252.  Once an agreement is voluntarily reached, state agencies are primarily responsible for approving, interpreting, and enforcing those agreements under state law.  47 U.S.C. § 252 (e).  Voluntary agreements under § 252 (a)(1) are not unrestrained.  State commissions are empowered to approve and interpret voluntary agreements, and may coerce agreement where parties fail to agree voluntarily.

The "presumption of incorporation" under Georgia law does not obstruct the purposes of the Act.  It does not hinder the federal government's efforts to facilitate competition and does not deny parties the ability to enter into voluntary agreements.  Rather, as noted above, the state law mandates the application of the federal statute.  Conflict preemption does not apply.  The Court holds that the Georgia common law presumption of incorporation is not preempted by the 1996

-33-

Act.  The GPSC did not err as a matter of federal law by applying the state law presumption of incorporation.

2.  *The GPSC's Interpretation of the June 2, 2000 Order*

a.  The "Demonstrate a Concern" Requirement

The GPSC concluded that footnote 86 of the June 2, 2000 Order required BellSouth to "demonstrate a concern" before it could audit NuVox.  (GPSC Order at 5.)

Read in its entirety and in the appropriate context of the body text that it clarifies, footnote 86 does not impose a requirement that ILECs must demonstrate a concern before an audit may be conducted.

Footnote 86 of the June 2, 2000 Order reads:

> The incumbent LEC and competitive LEC signatories . . .
> state that audits will not be routine practice, but will only
> be undertaken when the incumbent LEC has a concern
> that a requesting carrier has not met the criteria for
> providing a significant amount of local exchange service.
> We agree that this should be the only time that an
> incumbent should request an audit.

June 2, 2000 Order, 15 F.C.C.R. 9587, 9603 n.86 (2000) (citations omitted) (emphasis added).

-34-

Footnote 86 clarifies text from ¶ 31 of the June 2, 2000 Order.  Paragraph 31 reads:  "[I]ncumbent LECs may not require a requesting carrier to submit to an audit <u>prior to provisioning combinations of unbundled loop and transport network elements</u>." <u>Id.</u> at 9603 (emphasis added).  The text of ¶ 31 forbids an ILEC from conducting an audit prior to providing a CLEC access to unbundled network elements.  In other words, the default FCC rule, is that an ILEC cannot require an audit of a CLEC as a condition precedent to provisioning infrastructure access.  Paragraph 31 dictates that the ILEC must provision combinations of unbundled network elements to the CLEC without first conducting an audit.  In other words, paragraph 31 discusses the timing of audits and forbids PSCs from arbitrating audits as conditions precedent to access.

While footnote 86 provides general guidelines regulating audits and arguably audits conducted after providing infrastructure access, it is not a mandatory provision and seems, at most, to provide guidance to PSCs that are required to arbitrate an audit provision.  That is, to the extent PSCs are required to arbitrate an audit provision it suggests -- but does not require -- that a PSC consider including a showing of concern as a prerequisite to an audit.  To interpret footnote 86 to impose an independent "concern" requirement on all ILECs in all cases,

including negotiated agreements, is to read a single phrase of the footnote out of

context.

Moreover, footnote 86 does not use mandatory language.  In footnote 86, the

FCC states that ILECs "<u>should</u>" only request audits when they have a concern

about non-complying use.  This suggestive statement by the FCC does not require

that an audit condition be imposed.

The FCC has demonstrated both the will and the ability to use mandatory

language when it wishes to issue commands.  For example, in the sentence of ¶ 31

clarified by footnote 86, the FCC dictates:  "[I]ncumbent LECs <u>may not </u>require a

requesting carrier to submit to an audit prior to provisioning combinations of

unbundled loop and transport network elements." <u>Id.</u> at 9603 (emphasis added).

Later in the paragraph, the FCC mandates that:

> incumbent LECs <u>must</u> provide at least 30 days
> written notice to a carrier that has purchased a
> combination of unbundled loop and transport
> network elements that it will conduct an audit, and
> <u>may not </u>conduct more than one audit of the carrier
> in any calender year unless the audit finds non-
> compliance.

<u>Id.</u> at 9604 (emphasis added).

The FCC's use of the suggestive "should" instead of the coercives "must," "shall," or "is required" in footnote 86 is telling.  The most reasonable interpretation of the difference in language is that the FCC did not intend the merely suggestive portion to constitute a command.

The June 2, 2000 Order contains further support that the FCC did not intend the phrase "have a concern" in its 86th footnote as a directive.   Immediately after the audit discussion in ¶ 31, ¶ 32 emphasizes the LECs' ability to reach voluntary agreements concerning the scope of audit rights.  Paragraph 32 states:  "As the parties indicate, in many cases, their interconnection agreements already contain audit rights.  We do not believe that we should restrict parties from relying on those agreements."  Id. (emphasis added).  This declaration, immediately following ¶ 31, serves both to underscore the rights of the parties under § 252 (a)(1) to reach agreements without regard to § 251 (b) and (c) and to emphasize the role of the June 2, 2000 Order as a set of guidelines to assist PSCs in their roles as arbiters rather than as a set of generally applicable binding requirements.  Indeed, § 251 (b) and (c) defer to the preference incorporated in § 252 (a)(1), specifically that parties negotiate their interconnection agreements.  Sections 251 (b) and (c) command arbitration of "open" issues--issues on which parties cannot agree.

-37-

The GPSC's interpretation of the June 2, 2000 Order to mandate a "demonstrate a concern" condition for audit rights takes one phrase of a footnote out of context, ignores the suggestive rather than mandatory language chosen by the FCC, defies the emphasis on voluntary agreement found in ¶ 32, and misapprehends the role of the June 2, 2000 Order in the statutory scheme.[6]

---

[6] Had NuVox wanted to impose a "have a concern" requirement in the Agreement negotiated under § 252 (a)(1), it would have demanded its inclusion. If the parties could not agree on this audit provision, the GPSC could have required it to be arbitrated.

A "demonstrate a concern" requirement fundamentally changes the nature of the Agreement reached between BellSouth and NuVox. Paragraph 10.5.4 of the Agreement allows BellSouth a limited right to audit NuVox's traffic on BellSouth's EELs. The Agreement states no triggering event or condition preceding BellSouth's right to audit. In fact, under §10.5.4, BellSouth had no right to complain about NuVox's EEL traffic unless it verified through an audit that NuVox was not providing significant local exchange traffic. The lack of limitation in the audit provision provided significant incentive to NuVox to comply with the local traffic obligation. The "demonstrate a concern" condition imposed by the PSC disrupts this balance.

Respondents also argue that unless "have" is interpreted as "demonstrate," the "have a concern" language is unenforceable.(NuVox Brief at 33.) The lack of any enforceable obligations in footnote 86 (such as an obligation "to demonstrate") provides further evidence that the FCC did not intend the footnote to impose a mandatory requirement.

b.  The Independent Auditor Requirement

The GPSC also held that the June 2, 2000 Order requires BellSouth to use an "independent auditor" (i.e., an AICPA certified auditor) in conducting audits.   The GPSC divined this conclusion from ¶ 31of the June 2, 2000 Order.  For many of the reasons stated with respect to the "demonstrate a concern" issue, the GPSC erred by interpreting the June 2, 2000 Order to impose an "independent auditor" requirement.

Paragraph 31 of the June 2, 200 Order reads, in relevant part:

> There is broad agreement among the incumbent LECs and the competitive LECs on auditing procedures.  In particular, parties agree that incumbent LECs requesting an audit <u>should</u> hire and pay for an independent auditor to perform the audit . . .

<u>Id.</u> at 9604 (emphasis added).

Like the language of footnote 86, the "independent auditor" language of ¶ 31 is suggestive, not mandatory.  As noted above, the FCC demonstrates in the very

same paragraph its ability to use mandatory language when it wishes to imposed a mandatory obligation.[7]

The "independent auditor" suggestion is another guiding, and perhaps even strongly encouraged, principle to assist state PSCs in their role as arbiters of interconnection agreements between disagreeable private parties. That the GPSC would require an independent (AICPA) auditor in a voluntarily negotiated contract suggests that the GPSC sought to impose a general requirement not required by the June 2, 2000 Order. The purpose of the audit that is the subject of paragraph 10.5.4 of this Agreement is to verify "type of traffic being transmitted over combinations of loop and transport network elements." The Agreement does not

---

[7] Paragraph 1 of the June 2, 2000 Order does not alter the Court's conclusion. Paragraph 1 states:

> [LECs] must allow requesting carriers to self-certify that they are providing a significant amount of local exchange service . . . and we allow incumbent LECs to subsequently [sic] conduct limited audits by an independent third party to verify the carrier's compliance . . .

Id. at 9587-88 (emphasis added).

Here again the FCC declines to use the mandatory "must" in reference to the audit process. While LECs "must" allow self-certification, they are not compelled on the issue of audit procedure. The statement "we allow" is interpreted as a permissive rather than limiting statement, particularly in light of the emphasis on voluntary agreement in ¶ 32.

limit the type of audit permitted to a financial audit, and the nature of the audit suggests that other types of audit might be more appropriate or desired by BellSouth.  By requiring BellSouth to use an auditor with an accounting certification, the GPSC and NuVox seek to impose a limitation beyond the scope of the Agreement or the language of the June 2, 2000 Order.

In other words, ¶ 31 of the June 2, 2000 Order does not word its suggestion of an independent auditor as a command.[8]

D.  The GPSC'S Interpretation of the Agreement under Georgia Law

The GPSC argues that Georgia law incorporates into an agreement all pertinent laws.  (GPSC Order at 6); (GPSC Brief at 17-18.)  The GPSC further argues that Georgia law requires contracts that intend to deviate from the existing law to do so specifically.  (Id.)  Thus, the GPSC concludes that § 251 (b) and (c),

_____

[8] That the parties intended to distinguish between mandatory and permissive (or even recommended) requirements of law is underscored by §35.1 of the Agreement, which provides:  "Nothing in this Agreement shall be construed as requiring or permitting either Party to contravene any mandatory requirement of Applicable Law."  (emphasis added).

Section 35.1 merely serves to reserve the ability of the parties to agree to contract provisions so long as they do not violate mandatory obligations of the law. Contracting parties do this all the time (e.g., contracting parties routinely include provisions on choice-of-law even though state law dictates already what laws will apply to an agreement).

including the June 2, 2000 Order, are incorporated into the Agreement except where the parties specifically provide otherwise.  Because the Agreement does not expressly state that BellSouth is not required to demonstrate a concern or that BellSouth may use a non-independent auditor (and because the GPSC presumes, incorrectly, that the June 2, 2000 Order requires these restrictions), the GPSC concludes that the "concern" and "independent auditor" requirements must be read into the Agreement.  This reasoning is seriously flawed, disregards the Georgia law of contracts, and does not provide a reasonable basis for the GPSC's decision.

### 1. *The GPSC's Application of Georgia Contract Law*

The GPSC argues that Georgia contract law incorporates all existing law into every contract, unless the contract expressly states it will not be incorporated. (GPSC Order at 6); (GPSC Brief at 16-17.)  The GPSC refers to <u>Van Dyck v. Van Dyck</u>, 429 S.E.2d 914 (1993) and <u>Jenkins v. Morgan</u>, 112 S.E.2d 23 (Ga. App. 1959) to support this proposition.

The GPSC's statement of Georgia law is not itself arbitrary or capacious.  It is well established that "when parties contract, the terms thereof include applicable statutes."  <u>Freeman v. Decatur Loan & Finance Corp.</u>, 231 S.E.2d. 409, 411 (Ga. App. 1976).  "The laws which exist at the time and place of the making of a

contract, enter into and form a part of it; and the parties must be presumed to have contracted with reference to such laws and their effect on the subject matter." Satterfield v. Southern Regional Health Care Sys., ---S.E.2d.---, 2006 WL 2044694, *1 (Ga. App., July 24, 2006) (incorporating into a hospital-patient contract a Georgia statute that requires hospital rates to be publicly available upon request ) (citations omitted).  See also Cox v. Athens Regional Medical Center, 631 S.E.2d. 792, 797 (Ga. App. 2006) (same); Lay Bros., Inc. v. Golden Pantry Food Stores  Inc., 616 S.E.2d. 160, 163 (Ga. App. 2005) (incorporating into a lease Georgia's legal definition of "trade fixture" to determine that a store canopy was a "store fixture" and could be removed by the lessee without breach).

While the GPSC's statement of the law is correct, its application ignores that very same law, and is both unreasonable and clearly incorrect.  The GPSC applied the Georgia law presumption of incorporation inconsistently.  It incorporated the substantive obligations of §251(c) as implemented by the June 2, 2000 Order, but failed to incorporate the provisions and rights under § 252.  This selective incorporation is arbitrary and capricious.

The GPSC's error was its failure to recognize that under Georgia law § 252 (a)(1) is also incorporated into the Agreement.  The GPSC ignores that § 252 (a)(1)

is a federal statute which demands equal force, respect, and recognition as § 251

(c).  When BellSouth argued to the GPSC that § 252 (a)(1) allowed the parties to

enter into a voluntary interconnection agreement on terms acceptable to the parties,

the GPSC reasoned that the parties could do so only if they specifically and

expressly articulated each instance where they intended to alter the law:

> It is one thing to say an agreement that specifies a
> variance from existing law in one section reflects intent
> to follow existing law in a different section where no
> such specification is made, it is quite another to conclude
> that an agreement that specifies compliance with existing
> law in one section reflects intent to vary from existing
> law where no such specification is made.

(GPSC Order at 7.)

The GPSC refused to recognize that § 252 (a)(1) entitled BellSouth to

fashion an Agreement without a blanket incorporation of the June 2, 2000 Order.

BellSouth insisted that the GPSC enforce the rights provided under federal law for

voluntarily negotiated interconnection agreements.  The GPSC failed to do so.

Section 252 (a)(1) operates to suspend the application of 251 (b) and (c)

(and implementing regulations such as the June 2, 2000 Order) for interconnection

agreements negotiated voluntarily.  The rights granted by § 252 (a)(1) include the

right to incorporate or to ignore the provisions of § 251 (b) and (c) as the parties

choose -- a fact which the GPSC purported to recognize but failed to apply. (GPSC Order at 6-7.)

BellSouth and NuVox exercised their right under § 252 (a)(1), and negotiated voluntarily their representative interconnection rights.  The Agreement shows that BellSouth and NuVox were capable of incorporating discrete sections of the existing law into specific provisions of the Agreement when desired.  (See, e.g., Agreement at §§ 35.37, 10.2.2, 10.2.4, 10.5.2, 10.5.4.)  Such limited incorporations would have been unnecessary had BellSouth and NuVox intended a blanket incorporation of § 251 (c).  As another example, in § 10.5.4 they spelled out the terms of their negotiated agreement to allow unconditional audits only once a year. (Agreement, § 10.5.4.)

In short, Georgia contract law cannot be applied to pile the provisions of § 251 (c) into the Agreement, ignoring § 252 (a)(1) and the voluntary contracting rights it protects.  Georgia law demands that the Agreement be interpreted with regard to all applicable statutory provisions.  Section 252 (a)(1) grants parties the freedom to contract voluntarily and on their own terms, taking or leaving the provisions of § 251 (b) and (c) as they see fit.  The GPSC's application of Georgia law ignored several critical factors relevant to its decision--namely the rights

secured to the parties by § 251 (a)(1) and the clear requirements of the contract law the GPSC purported to apply. The GPSC's decision constituted a clear error in judgment, and was both unreasonable and contrary to law. The GPSC's application of Georgia law thus was arbitrary and capricious.

### 2. *The GPSC's Interpretation of the Agreement*

The GPSC also argued that § 35.1 of the Agreement explicitly incorporated the June 2, 2000 Order and other laws:

> Each Party shall comply at its own expense with all applicable federal, state, and local statutes, laws, rules, regulations, codes, effective orders, decisions, injunctions, judgments, awards, and decrees that relate to its obligations under this Agreement. Nothing in this Agreement shall be construed as requiring or permitting either Party to contravene any mandatory requirement of Applicable Law. . .

(Agreement § 35.1.)

The GPSC asserts this provision proves that the parties did not "intend[] to differ from applicable law, but . . . state the exact opposite." The GPSC interprets § 35.1 as the foundation for its blanket incorporation of the June 2, 2000 Order. (GPSC Brief at 19.)

a.  Relevant Georgia Contract Law

Under Georgia law, the "cardinal rule of contract construction is to ascertain the intention of the parties."  Lay Bros v. Golden Pantry Food, 616 S.E.2d. 160, 163 (Ga. App. 2005) (citations omitted).  See also Johnson v. U.S. Fidelity & Guaranty Co., 91 S.E.2d 779, 782 (Ga. App. 1956).  A contract must be considered as a whole document.  Lay Bros., 616 S.E.2d. at 163 ("the whole instrument . . . must be considered").  Courts should "avoid any construction that renders portions of the contract meaningless."  RLI Ins. v. Highlands of Ponce, L.L.C., ---S.E.2d. ---, 2006 WL 1827456, *4 (Ga. App., July 5, 2006) citing Holloman v.D.R. Horton, Inc., 524 S.E.2d 790, 793 (Ga. App. 1999).  When a provision of the contract specifically addresses an issue, "it prevails over any conflicting general language."  RLI Ins., 2006 WL 1827456 at *4.  See also Versico, Inc. v. Engineered Fabrics Corp., 520 S.E.2d. 505, 509 (Ga. App. 1999).

Contract interpretation under Georgia law is a stepped process:

> (1) Is the language clear and unambiguous?  If it is, the court simply enforces the contract according to its terms.  If it is ambiguous, (2) the court must apply the rules of contract construction to resolve the ambiguity.  If the ambiguity cannot be resolved, (3) the issue of what the ambiguous

> language means and what the parties intended must
> be resolved by a jury.

Harris v. Distinctive Builders, Inc., 549 S.E.2d. 496, 498-99 (Ga. App. 2001). See also Hall v. Ross, 616 S.E.2d. 145, 147 (Ga. App. 2005).

Georgia law emphasizes the importance of construing a contract by its terms. "[N]o construction is required or even permissible when the language employed by the parties is plain, unambiguous, and capable of only one reasonable interpretation." (emphasis added) (citations omitted).  Cox v. Athens Regional Medical Center, 631 S.E.2d 792, 796 (Ga. App. 2006). A contract is not ambiguous (and thus permissible to be construed)  "unless and until an application of pertinent rules of interpretation leaves it uncertain to which of two or more possible meanings represents the true intention of the parties."   Lay Bros v. Golden Pantry Food, 616 S.E.2d. 160, 163 (Ga. App. 2005).  Contractual terms are to be accorded their plain and ordinary meaning, and technical terms of art are accorded their meaning in the art.  Johnson v. U.S. Fidelity & Guaranty Co., 91 S.E.2d 779, 783 (Ga. App. 1956).

The rules of contract construction in Georgia are dictated by statute.  In relevant part, Georgia Code § 13-2-2 lays out the following principles "used in arriving at the true interpretation of contracts":

> (1) Parol evidence is inadmissable to . . . vary a written contract . . . .

> (2) Words generally bear their usual and common signification; but technical words, or words of art . . . will be construed, generally, to be used in reference to [their] particular meaning. . . .

> (4) The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part;. . . .

Ga. Code. Ann. § 13-2-2 (2006).

Under Georgia law, Courts are reluctant to imply contractual terms.  Implied terms "can only be justified when the implied term is not inconsistent with some express term of the contract and where there arises from the language of the contract itself . . . an inference that it is absolutely necessary to introduce the term to effectuate the intention of the parties."  WirelessMD, Inc. v. Healthcare.com Corp., 610 S.E.2d 352, 355 (Ga. App. 2005).  In other words, "[a]n implicit

contractual provision exists where such provision is necessary to effect the full purpose of the contract and is so clearly within the contemplation of the parties that they apparently deemed it unnecessary to state it." Barger v. Garden Way, Inc., 499 S.E.2d 737, 741 (Ga. App. 1998).

Georgia law particularly frowns upon implying conditions precedent. Conditions precedent are "not favored," but are "created by language such as 'on condition that,' 'if,' and 'provided,' or by explicit statements that certain events are to be construed as conditions precedent. Hall v. Ross, 616 S.E.2d. 145, 147 (Ga. App. 2005) (emphasis added).

### b.  The GPSC's Interpretation of the Agreement

The GPSC interpreted § 35.1 of the Agreement to incorporate the June 2, 2000 Order, and, based on that incorporation, implied all of the restrictions and obligations of the June 2, 2000 Order into § 10.5.4.  This interpretation is contrary to basic principles of Georgia law, and is thus arbitrary and capricious

First, the GPSC failed to identify any ambiguity in the Agreement before engaging in its construction of the Agreement's ultimate meaning beyond the plain language of its provisions.  The GPSC expressly recognized that contracts are not

to be construed unless found to be ambiguous.  (GPSC Order at 7.) ("Unless a contract is ambiguous, a the finder of fact need not look any further than the language in the agreement to determine the intent of the parties.").  Directly after stating correctly this principle of law, and without noting any ambiguity in the Agreement, the GPSC Order states, "Construing [§10.5.4]. . . results in the conclusion that BellSouth is obligated to demonstrate a concern."  Id. (emphasis added).

Because the GPSC did not find any ambiguity in § 10.5.4, it was obligated to interpret the Agreement based on its plain, unambiguous language.  Section 10.5.4 states two restrictions on BellSouth's ability to audit NuVox:  (1) BellSouth must give NuVox 30 days notice; and (2) BellSouth must pay for the audit.  Nowhere do the parties manifest an intention to incorporate the additional restrictions of the June 2, 2000 Order or to imply or impose any other conditions. The parties' decision to include those two restrictions while declining to mention other provisions suggested by the June 2, 2000 Order (such as using an independent auditor and limiting audits to when ILECs have a concern over local exchange carrier traffic amounts) represents an unambiguous intention to include only those two provisions in the Agreement.  Even more tellingly, § 10.5.4 incorporates some

of the June 2, 2000 Order by reference to the limited purpose of defining the terms of non-compliance, and also tracks the language of ¶ 31 of the June 2, 2000 Order in imposing a once-per-year and thirty-day notice requirements.  Section 10.5.4 of the Agreement does not, however, incorporate by reference or otherwise the "demonstrate a concern" or "independent auditor"  requirements the June 2, 2000 Order.

In short, the GPSC failed to identify any ambiguity in § 10.5.4, and was accordingly required by Georgia law to interpret the Agreement by its plain language.  A plain language interpretation of §10.5.4 does not impose a "demonstrate a concern" or "independent auditor" requirement on BellSouth's audit right.  Nothing in the provision indicates clearly that a condition precedent was meant to be implied.  The GPSC's interpretation ignored the requirements of Georgia contract law, which constituted an important factor relevant to its decision.  Accordingly, the GPSC's interpretation was arbitrary and capricious.

Under Georgia's statutory scheme of contract construction, contracts are to be construed as a whole and to avoid rendering any provision meaningless.   RLI Ins. v. Highlands of Ponce, L.L.C., ---S.E.2d.----, 2006 WL 1827456, *4 (Ga. App., July 5, 2006).  See also Holloman v.D.R. Horton, Inc., 524 S.E.2d 790, 793

(Ga. App. 1999).  When a provision of the contract specifically addresses an issue, "it prevails over any conflicting general language."  Id.

The provisions of the Agreement contain several limited incorporations of federal law for the purpose of governing or defining limited aspects of specific agreement provisions.  (See, e.g., Agreement at §35.37, § 10.2.2, § 10.2.4, § 10.5.2, § 10.5.4.)  If § 35.1 were interpreted to constitute a general incorporation of all relevant federal law, each of the limited incorporation provisions above would be rendered meaningless and redundant.[9]  Such an interpretation is invaded under Georgia law.

Section 10.5.4 is a specific provision laying out the parties' audit rights and duties.  Section 35.1 is a generalized provision stating an intention by the parties to comply with the law.  To the extent that these provisions conflict, Georgia law dictates that § 10.5.4 prevails.[10]

_____

[9]  By contrast, if § 35.1 were construed to demonstrate a general intent by the parties to comply with (rather than incorporate) the law, then the more limited incorporations later in the contract would retain their meaning.

[10]  The GPSC Order also asserts the testimony of Hamilton B. Russell to prove that NuVox and BellSouth intended to effect a blanket incorporation of the June 2, 2000 Order into § 10.5.4 of the Agreement.  (GPSC Order at 8); (GPSC Brief at 30-31.)  This assertion violates Georgia contract law in two respects.  First, seeking the intent of the agreement outside of the plain language of the contract is

On its face, § 10.5.4 is plain and unambiguous.  BellSouth reserves the right

to conduct an audit if two conditions are met:  (1) thirty days notice; and (2)

BellSouth pays for it.  Nowhere does § 10.5.4 restrict which auditor BellSouth is

entitled to use[11] or mandate that BellSouth must demonstrate a concern prior to

---

impermissible until an ambiguity is found.  Second, the testimony of Mr. Russell is
parol evidence which is by statute "inadmissible to add to, take from, or vary a
written contract."  Ga. Code Ann. § 13-2-2.  No party claims that the Agreement
was not a complete embodiment of the deal struck by the parties.  Accordingly, Mr.
Hamilton's testimony is not entitled to any weight in determining the intentions of
the parties.

[11]  BellSouth's Amended Petition appears to take issue only with the
requirement of AICPA certification.  (First Am. Pet. ¶ 36.)  BellSouth's briefing,
however, makes the broader argument that there is no "independent auditor"
requirement of any kind in the Agreement. (BellSouth Brief at 18.)
    The parties did not raise to the GPSC or to the Court the issue of what
requirements the Agreement, properly construed under Georgia law, might impose
on BellSouth's audit rights.  The parties limited themselves to a discussion of
whether the independent auditor requirement from the June 2, 2000 Order was
incorporated to the Agreement.  While holding that the Agreement does not
incorporate the June 2, 2000 Order, the Court expresses no opinion concerning
whether the Agreement itself, properly construed under the Georgia law of
contracts, might impose some manner of "independence" requirement on the audit
right.
    If the parties had understood each other to have interpretations of the
Agreement as diametrically opposed as those represented in the briefing , they
likely would not have agreed in the first instance.  Likewise, if the GPSC had
understood § 10.5.4 to impose no requirements whatsoever on the nature of the
audits conducted by BellSouth, it might not have approved the Agreement.  The
GPSC is best suited first to interpret the requirements of the Agreement's audit
provision if the meaning of that provision is further disputed by the parties.

seeking to conduct an audit.   NuVox could have contracted for more extensive

audit rights.  It choose not to do so.

## III.  CONCLUSION

The regulatory scheme here allowed BellSouth and NuVox the prerogative

to enter into an interconnection agreement so long as they abided by the

requirements set forth by federal law.  The parties negotiated their agreement

voluntarily.  In doing so they specifically acknowledged, based on arms-length

negotiation, that they agreed to the following provision of audit rights:

> BellSouth may, at its sole expense, and upon thirty
> (30) days notice to [Nuvox], audit [Nuvox's]
> records not more than one [sic][12] in any twelve-
> month period, unless an audit finds non-
> compliance with the local usage options referenced
> in the June 2, 2000 Order, in order to verify the
> type of traffic being transmitted . . .

To interpret the agreement as urged by NuVox and the GPSC would violate the

agreement reached by the parties and impose an obligation that was not expressed

by the FCC's June 2, 2000 Order, and it would subvert the agreement that the

parties on June 30, 2000 thought was in their best interests.

---

[12]  The court interprets this as either "one time" or "once."

-55-

The GPSC erred as a matter of federal law by interpreting the FCC's June 2, 2000 Order to impose "demonstrate a concern" and "independent auditor" requirement onto BellSouth's right to audit NuVox under the Agreement.  The GPSC also failed to consider important factors relevant to its decision and committed clear error when it ignored Georgia law in its interpretation of the Agreement to effect a blanket incorporation of all of the provisions of the June 2, 2000 Order.

It is hereby **ORDERED** that BellSouth's First Amended Petition for Judicial Review and Complaint for Declaratory and Injunctive Relief [3] is **GRANTED-IN-PART** and **DENIED-IN-PART**.

It is further **ORDERED** that the Court **GRANTS** the Amended Petition by vacating the following findings and orders of the June 29, 2004 and August 24, 2004 Orders issued by the Georgia Public Service Commission:

> (1) that the June 2, 2000 Order imposes a "demonstrate a concern" requirement;

> (2) that the June 2, 2000 Order imposes an "independent auditor requirement;

(3) that the Agreement requires BellSouth to demonstrate a concern prior to conducting audit; and

(4) that the Agreement requires BellSouth to use an independent auditor.

It is further **ORDERED** that BellSouth's request for injunctive relief is **GRANTED**. Consistent with this Order, the Georgia Public Service Commission and NuVox are enjoined from enforcing those findings of the June 29, 2004 and August 24, 2004 Georgia Public Service Commission Orders that the Agreement incorporated "demonstrate a concern" and "independent auditor" requirements as part of § 10.5.4 of the Agreement.

It is further **ORDERED** that the Court **REMANDS** this matter to the Georgia Public Service Commission for further proceedings consistent with this Order.

**SO ORDERED** this 12th day of September, 2006.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE